# Illinois Official Reports

## Appellate Court

---

### *People v. Ruiz*, 2019 IL App (1st) 152157

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ABEL RUIZ, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-15-2157 |
| Filed<br>Rehearing denied | March 15, 2019<br>April 11, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-13196; the Hon. Vincent M. Gaughan, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Adrienne N. River, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CONNORS delivered the judgment of the court, with opinion.<br>Presiding Justice Delort and Justice Cunningham concurred in the judgment and opinion. |

**OPINION**

¶ 1      Following a jury trial, defendant, Abel Ruiz, was convicted of first degree murder and sentenced to 51 years in prison. On appeal, defendant contends that the trial court should not have allowed into evidence, as tacit admissions, portions of a police station video recording that included certain statements from a co-arrestee. Defendant also asserts that the mittimus should be corrected to reflect an additional day of presentence custody credit. We affirm and correct the mittimus.

¶ 2                                        I. BACKGROUND

¶ 3      The record reveals that defendant shot the victim, Brandon Cage, in the early morning hours of June 12, 2013, near the intersection of 60th Street and Homan Avenue in Chicago. Cage died from his injuries. At trial, defendant asserted that he shot Cage in self-defense. This appeal concerns the use of a police station video recording that captured defendant's conversation with a co-arrestee, Steve Cervantes.

¶ 4      On April 24, 2014, defendant filed a motion to suppress statements. In part, defendant stated that while at the police station after the incident, defendant and other arrestees communicated with each other through the walls and doors of different rooms.[1] Defendant asserted that those private communications were captured by illegal eavesdropping via video recording. On August 5, 2014, defendant filed an amended motion to suppress statements. Defendant stated that his invocation of the fifth and sixth amendments was inadmissible under *Doyle v. Ohio*, 426 U.S. 610 (1976). Defendant also asserted that any statements made by him more than six hours after his arrest should be suppressed.

¶ 5      After a hearing, the trial court denied defendant's motions. In its ruling, the court stated in part that the police did not act surreptitiously and are required to have video recorders on when witnesses or the accused are interrogated in homicide cases. Thus, there was no expectation of privacy in the rooms at the police station.

¶ 6      Prior to trial, defendant again tried to exclude recorded statements by filing a motion *in limine* to preclude the introduction at trial of a conversation between defendant and co-arrestee Cervantes that took place in adjacent rooms at the police station shortly after the incident. During the conversation, Cervantes stated, "You always take things too far," "You guys f*** take things too far, dude," "For real, dude, you guys take things too f*** far," "You went too far, dude," "Come on, man. No s*** man, you guys take things too f*** far," and "You guys take s*** too far, dude." Defendant stated that he had asserted self-defense and the reasonableness of his actions was directly at issue. According to defendant, Cervantes's commentary about defendant's past actions was irrelevant, inadmissible, and highly prejudicial. At a subsequent hearing, the State asserted that Cervantes's statements were responses to defendant's questions. The State also did not intend to argue "any prior bad acts for motive."

---

[1]We refer to the places where defendant and his co-arrestees were held at the police station as "rooms." In the record and in the parties' briefs on appeal, different terms are used for the place at issue, including an interrogation room, an ERI room, and a cell. A stipulation entered at trial referred to defendant being in Room 6 and a co-arrestee being in Room 8. For consistency, we use the term "room."

¶ 7        Ultimately, the court denied defendant's motion *in limine*. The court found that the conversation between defendant and Cervantes was not entitled to any constitutional protections because it was not prompted by the police or law enforcement. The court further stated that the statements were voluntary and defendant "could have said, 'Listen, you're out of line by saying this,' otherwise it could be considered *** an admission by silence."

¶ 8        The matter proceeded to trial. The State's witnesses included two people who were with the victim, Cage, just before the shooting: Joseph Santiago and Amber Glassco. Santiago acknowledged that he had a prior conviction for misdemeanor theft and further testified as follows. In the early morning hours of June 12, 2013, he was at his house having beers with friends, including Glassco, who was his girlfriend. Santiago and Glassco wanted cocaine, so around 1 a.m., they drove Santiago's van to the home of their friend, Brandon Cage, because Cage knew someone who sold cocaine. After a brief discussion, Santiago, Glassco, and Cage went to 60th Street and Homan Avenue. Cage sat in the back passenger-side seat of the van, Glassco sat in the front passenger seat, and Santiago drove. When they arrived, Cage went to the spot "where he would normally get cocaine" while Santiago and Glassco stayed in the van with the windows down.

¶ 9        Santiago further testified that a dark Ford Taurus drove by and Santiago heard, "Ho, ho, ho. Hold up. Hold up." The Taurus stopped in front of Santiago's van, and defendant emerged from the back passenger seat. Defendant was wearing a jersey and shorts and had a shag hairstyle, which meant he had "long hair from the bottom down." Defendant pulled up his shirt, pulled out a gun, and approached Santiago's open window, where defendant put the gun to Santiago's head and asked, "What are you?" Santiago replied, "Nothing," meaning that he was not part of a gang. Defendant then told Santiago to "drop the forks," and Santiago complied. Defendant said, "You're lucky. I would have killed your a***." You're lucky your girlfriend's here," and walked back to the Taurus. At that point, Cage returned from getting the cocaine and said, "What's up?" to defendant, who was about 10 feet away from Cage. Defendant asked, "Well, what you is?" and Cage replied, "GD Folks." Defendant walked toward Cage, shot him three times, and ran to the back passenger seat of the Taurus, which left the area. Santiago told Glassco to call 911. After the police arrived and Santiago talked to the officers, Santiago was placed in the backseat of a police car where, in a show-up identification, he identified defendant as the person who shot Cage.

¶ 10        According to Santiago, before the shooting, Cage did not make any physical contact with defendant, take any swings or slaps or try to punch defendant, or make any threatening comments to defendant. Santiago also stated that Cage was not close enough to hit defendant if he tried. Further, Cage did not have any weapons on him.

¶ 11        Glassco testified as follows. A little after midnight on June 12, 2013, she and Santiago were at their apartment watching a basketball game and drinking. Around 1 a.m., Glassco and Santiago drove to Cage's house in their van. After they picked up Cage, they drove to 60th Street and Homan Avenue to buy drugs. When they arrived, Cage went to make the purchase, and Santiago and Glassco stayed in the van. A male voice came from the driver's side and asked Santiago "what he was." Santiago blocked Glassco's view of the man's face, but Glassco could see that the bottom part of his hair was long. The man told Santiago to "[d]rop the forks." After Santiago complied, the man told Santiago that he was lucky that Glassco was sitting next to him because the man would have shot Santiago otherwise. While the man walked to a dark Ford Taurus that was in front of the van, Cage returned and said, "What's up?

Folks." The man asked what Cage was. After Cage replied, "I'm GD," the man shot at Cage. A gun was pointed at Cage, and Glassco heard three shots. Cage fell to the ground, and the man ran to the Taurus, which drove off. Glassco called 911. Glassco denied seeing Cage with a weapon or seeing Cage threaten or hit the man.

¶ 12    On cross-examination, Glassco stated that she was unable to see the man's body, face, and hands when he approached the van. Glassco also admitted that she could not identify the shooter in a show-up identification at the scene or in a later lineup at the police station.

¶ 13    Also testifying for the State was Kristina Diosdado, who had been with defendant before the incident and stated as follows. On June 11, 2013, Diosdado spent the day at the beach with defendant, Andres Davila,[2] and Cervantes, who was her boyfriend. Defendant's nickname was "Ghost," and Davila's nickname was "Tiny." The group eventually drove to defendant's house, where Cervantes became so intoxicated that he fell asleep. After a few hours, Diosdado left to drive Cervantes home. Diosdado drove a dark green Ford Taurus, Cervantes sat in the front passenger seat, and defendant, who came along, sat in the back passenger seat. Diosdado drove around with the windows down so Cervantes could get fresh air and perhaps wake up. When the Taurus approached 60th Street and Homan Avenue, defendant asked to stop and jumped out of the car. Using the rearview mirror, Diosdado observed defendant approach the driver's side of a van that was behind them. Since the Taurus's windows were down, Diosdado heard defendant check the occupants—a man and a woman—for gang affiliations. Defendant also spoke to a man that Diosdado stated was Cage, though she did not know the man's name at the time. Defendant said, "King love," and Cage said, "I'm Folks," whereupon Diosdado heard three or four shots. Diosdado did not see Cage punch or swing at defendant and did not hear anyone say, "I'll smoke you" or "take your things." Defendant returned to the Taurus and told Diosdado to "go." Defendant had a gun on his lap. Diosdado drove around and encountered Davila, who jumped into the car. A few blocks later, the police pulled over the Taurus.

¶ 14    On cross-examination, Diosdado admitted that she did not see what occurred between defendant and Cage and did not know if Cage struck defendant.

¶ 15    The State also presented testimony from several law enforcement officials, including Officer Filiberto Rosas, who testified that after he monitored a call at about 1:25 a.m. on June 12, 2013, he pulled over a car where defendant was sitting in the backseat. After a search, a gun was found underneath the front passenger seat. Ellen Chapman, a forensic scientist for the Illinois State Police forensic crime center, testified that based on a gunshot residue analysis, defendant discharged a firearm, contacted a gunshot residue-related item, or was in the environment of a discharged firearm. The parties stipulated that Dr. James Filkins, who retired from the Office of the Cook County Medical Examiner, would testify that Cage was 5 feet, 11 inches, and weighed 254 pounds. Dr. Filkins observed three gunshot wounds on Cage's abdomen and chest. Dr. Filkins would further testify that Cage's cause of death was multiple gunshot wounds and the manner of death was homicide.

¶ 16    Detective Michael Jackson testified that after the incident, defendant, Diosdado, Cervantes, and Davila were taken to a police station and placed in separate rooms. Defendant's and Cervantes's rooms were across from each other. Each room had video surveillance that was activated the entire time each person was in custody. A video camera is permanently

---

[2]Diosdado referred to this person as "Andrew" and "Tiny." On cross-examination, defense counsel referred to this person as Andres Davila.

mounted in the corner of each room and records anything that happens inside the room. Detective Jackson stated that the rooms are locked from the outside and the person inside is not free to leave. At one point, Detective Jackson was notified that people in the rooms were yelling and talking to each other in Spanish. A Spanish-speaking officer believed that they were discussing the incident.

¶ 17 The parties entered the following stipulation about the conversation between Cervantes and defendant at the police station. Officer Raul Cortez would testify that his first language was Spanish and he was fluent in English and Spanish. On June 12, 2013, he listened to a conversation between defendant and Cervantes. Officer Cortez would testify that he understood what was being said in Spanish. The conversation was video-recorded and translated from Spanish to English. Officer Cortez watched the video recording of the conversation and would testify that it accurately represented defendant and Cervantes's conversation. Further, Officer Cortez read the Spanish-to-English translation, which was true and accurate to the best of his knowledge.

¶ 18 At that point, the State moved to enter into evidence the DVD recording of defendant's room at the police station, which captured the conversation between defendant and Cervantes. In a sidebar, defense counsel objected, noting that he had previously objected to the DVD being admitted. Defense counsel stated that the DVD contained prejudicial hearsay statements from Cervantes, and it was counsel's understanding that the State would give the jury transcripts of the conversation that were transcribed by the State. In response, the State maintained that the words coming from people other than defendant were not being offered as evidence. The State also asserted that the jury would be instructed not to consider what was heard from others as evidence. Further, the transcripts served as a demonstrative aid and would not go back in evidence. The State added that it had prepared an instruction that the jury was not to consider the transcripts as evidence. The court overruled defense counsel's objection to admitting the DVD.

¶ 19 Before the DVD was played, the court told the jury the following:

"Ladies and gentlemen, by now you should have been provided with a transcript of the video that's about to be played. I just want to give you a little information concerning this. This is not evidence, this is what we call demonstrative evidence, this means it's going to aid you in watching the video. The only evidence is the video. You will not get these transcripts back into the jury room."

¶ 20 The DVD was then played for the jury. The transcript was not entered into evidence. Below are excerpts of the conversation between defendant and Cervantes that was shown on the DVD.[3]

"OFFICER: I'll be with you in a minute.
DEFENDANT: Hey officer! Hey officer! I need to use the bathroom, man.
OFFICER: (Inaudible)
DEFENDANT: Hey, Flay?

---

[3]The excerpts are from a transcript prepared by appellate defense counsel that contains the captions at the bottom of the video recording. The written transcript that was given to the jury is not in the record. The State agrees that appellate defense counsel's transcript accurately reflects the captions at the bottom of the video recording.

CERVANTES: What up?

DEFENDANT: What's up dude?

CERVANTES: What's going on?

DEFENDANT: Man, dog.

CERVANTES: What happened?

DEFENDANT: We did a f*** job, dude.

CERVANTES: Who?

DEFENDANT: I did.

CERVANTES: Huh?

DEFENDANT: I did it.

CERVANTES: And what happened?

DEFENDANT: Some a***, dude. You know, dude.

CERVANTES: No, what happened?

DEFENDANT: What do you mean what happened?

* * *

DEFENDANT: Hey, officer

OFFICER: Yep?

DEFENDANT: Can I use the bathroom after him?

OFFICER: Absolutely

DEFENDANT: Thanks

* * *

DEFENDANT: What the f***, man? They got me handcuffed dog.

CERVANTES: What—what did they tell you?

DEFENDANT: Nothing that—that they are investigating, dude, but they found the f*** cannon in the car, dude.

CERVANTES: And who did they blame?

DEFENDANT: Nobody, dude. They just—they just took us, dude, but I told this guy run, dude, and the guy just put it under the car, dude.

CERVANTES: Who?

DEFENDANT: Tiny put the cannon under the seat. I told this guy to run, dude and guy didn't run. Hey!

* * *

DEFENDANT: I caught—I caught an a*** over there, dude. I caught a f***, dude.

CERVANTES: And what happened?

DEFENDANT: I let him have it, dude.

CERVANTES: But who is going to take the blame, dude?

DEFENDANT: Man, n***, this guy told me—he's all like, look when I told him to run he's all like, man, I'm going to say it's mine dude. That's what he told me.

CERVANTES: Don't f*** around, dude. You guys go f*** overboard.

DEFENDANT: Man, dude, I told this guy dog—run, dude. The guy didn't run. He just put it under the—the—the seat, dude.

CERVANTES: Hey, dude. Hey

DEFENDANT: Yo.

* * *

CERVANTES: Hey man, I—you guys do f*** up s***, dude.

DEFENDANT: Why dude?

CERVANTES: Because right now man they have something on all of us.

DEFENDANT: (Audible sound) Dude, you were—you were sleeping or very drunk, dude.

CERVANTES: So what! But who do they (inaudible) the f*** gun with there?

DEFENDANT: What?

CERVANTES: Don't f*** around dude. You guys do some f*** up s***.

DEFENDANT: I told this guy run dude and this guy didn't want to. I'm going to tell them it's mine, dude.

* * *

DEFENDANT: Hey officer!

OFFICER: I'll be with you in a minute, man.

* * *

CERVANTES: You guys f*** take things too far, dude. It was really hot with—

DEFENDANT: Huh?

CERVANTES: —with—with cops, dude. I don't even know, dude. Hey dude.

DEFENDANT: Yeah.

CERVANTES: For real, dude, you guys take things too f*** far. You have to do something, dude.

DEFENDANT: That guy said he was going to take the blame, dude. I told this guy to run dude and the guy didn't run. I told him way before that they were going to stop us when—when we saw the cops I told him, get out dude and run dude. Just put it under the seat, dude. He said, I'm going to say that it's mine. That's what he told me, dog.

CERVANTES: But don't f*** around, dude. I'm here and also my lady.

* * *

DEFENDANT: Where is she?

CERVANTES: I don't know, dude. You went too far, dude.

(Officer enters room.)

OFFICER: You're under cuff?

DEFENDANT: Hmm-hmm, why do they got me handcuffed? (inaudible)

OFFICER: Why do you think?

* * *

OFFICER: Come on, use the bathroom.

(Defendant and officer leave the room).

CERVANTES: Ghost.

DEFENDANT: Yo.

CERVANTES: Where you at?

DEFENDANT: In the bathroom.

CERVANTES: Where is f*** Tiny, dude?

DEFENDANT: I don't know, dog.

CERVANTES: You guys take things to [*sic*] f*** far, dude, man! Hey dude.

DEFENDANT: Yeah.

CERVANTES: What—what was the f*** stupid fight about, dude.

DEFENDANT: Huh?

CERVANTES: What were all of you doing yesterday, dude?

DEFENDANT: Yesterday we went to eat, a***.

CERVANTES: And you filled him up with lead?

DEFENDANT: Hell yeah.

CERVANTES: Hey dude.

DEFENDANT: Yeah.

CERVANTES: Don't f*** around, dude, well tell them something dude. I—I didn't even know.

OFFICER: You set man?

DEFENDANT: Yes sir. The water doesn't work?

OFFICER: I know.

DEFENDANT: I can't get a drink of water?

OFFICER: Yeah, I'll bring you some water. I got a lot of stuff going on here.

DEFENDANT: (Inaudible)

(Defendant and officer return to room.)

OFFICER: What the f***?

DEFENDANT: Do you really got to handcuff me?

OFFICER: Yeah, I do. I really do. What I'm gonna do though is I'm gonna double lock them. They can't get any tighter, okay?

DEFENDANT: All right.

OFFICER: All right.

DEFENDANT: Thanks

OFFICER: (Audible sound)

DEFENDANT: I really appreciate that water, sir.

OFFICER: I'll get it.

DEFENDANT: Thanks

OFFICER: I feel like I'm runnin' a hotel over here. I'll be back to talk to you.

DEFENDANT: All right.

(Officer leaves the room.)

* * *

CERVANTES: Come on, man. No s***, man, you guys take things too f*** far.

CEVANTES: No—hey.

DEFENDANT: What?

CERVANTES: Did they get the—the gun?

DEFENDANT: Yeah, n***, I told you—I told you what happened, dude. This idiot I told guy to run I told the guy to run, man and—and this guy said he put it under the seat and he said, I'm going to say it's mine. That's what he said, dog. I tellin' this n***, run dude, run your a*** off—run and this guy didn't want to, dude.

CERVANTES: F*** dumb guy. What happened, man?

DEFENDANT: I filled a guy with lead close range, n***.

CERVANTES: What?

DEFENDANT: Close range—I filled him with lead, dude. (Inaudible)—

* * *

CERVANTES: Tell them I didn't do anything, dude.

DEFENDANT: A'ight.

CERVANTES: Tell them right now.

DEFENDANT: Wait when the guy gets here.

CERVANTES: You guys take things too f*** far, dude.

CERVANTES: Tiny?

DEFENDANT: I think they are interrogating that guy, dog.

* * *

DEFENDANT: Where's your lady at?

CERVANTES: Oh, a***, they have her arrested too, dude.

DEFENDANT: I know, but where at? N***, where's she at?

CERVANTES: Downstairs. You guys take things too f*** far, dude.

DEFENDANT: F*** man.

CERVANTES: Well tell them, dude, for real.

* * *

CERVANTES: Hey dude.

DEFENDANT: Yeah.

CERVANTES: Did you see the f*** fall?

DEFENDANT: He fell, dude, in front of me, dude. And when I—and when I tried to fill him up with lead again I didn't have anymore, dude. I let him have like four or five, dude. Hey dude!

CERVANTES: Yes.

DEFENDANT: When you get out, dude, ask your old lady. She saw everything, dude.

* * *

CERVANTES: Stop screwing around, dude. Tell them something, dude. Tell them I didn't even know.

DEFENDANT: Huh?

CERVANTES: But tell them dude, that—that I didn't even know. Knock and tell him, dude.

DEFENDANT: Hey officer. Man dog, this guy told me he was going to take the blame, dog. F*** man!

CERVANTES: Oh yes, okay! That's why they have all of us, dude.

DEFENDANT: F*** man.

CERVANTES: Officer.

DEFENDANT: Officer.

* * *

CERVANTES: What happened?

DEFENDANT: They came out with their guns and told us to—to put our hands up.

CERVANTES: No s***, dude. I was so drunk, dude. Tell them, dude.

DEFENDANT: Hey officer.

CERVANTES: Hey dude.

DEFENDANT: Yeah.

* * *

(Video ends.)"

¶ 21 After the video ended, the State rested. The DVD, among other items, was admitted into evidence.

¶ 22 Testifying in his defense, defendant admitted that he was convicted of armed robbery in 2008 and further stated as follows. On June 11, 2013, defendant, Davila, Cervantes, and Diosdado went to Lake Michigan and then to defendant's house. The group drank and had a cookout in defendant's backyard. Sometime after midnight on June 12, Cervantes became very intoxicated and passed out. Meanwhile, Diosdado asked defendant for cocaine. Defendant did not know where to get cocaine, but Davila did and he made some phone calls. Eventually, the group left in Diosdado's car, with Diosdado driving and Davila directing her to the purchase location. When the group arrived at 60th Street and Homan Avenue, Davila told defendant to go and that the seller would come up a gangway. Davila also gave defendant a gun, which defendant put in his waistband and then walked toward the sidewalk, where he saw a black man, later known to be Cage. Thinking Cage was the seller, defendant approached him. Cage said, "What up, Folks?" Because defendant was a Latin King and opposed to the Folks alliance, he replied, "I ain't no m***f*** Folks." After Cage asked, "Then what the f*** you doing in my hood, b***?", defendant responded that he was there to meet somebody. Cage said, "You better take your a*** home before I take all your s*** and smoke your a***," which defendant understood to mean a threat to rob and kill him. Cage smacked defendant on the left side of the head with an open hand. Defendant stepped back, and Cage came at defendant with his fists balled up. Defendant guarded his face with his arm, took out the gun, and fired "back to back to back." Cage fell and defendant ran to the car, where he returned the gun to Davila.

¶ 23 Defendant explained that he fired the gun because he was scared for his life due to Cage's threats and subsequent attack. Defendant stated that at the time, he was 5 feet, 5 inches, weighed around 135 pounds, and Cage was "big *** bigger than me." Defendant denied

having any interaction with anyone inside a van and did not recall seeing a van at 60th Street and Homan Avenue.

¶ 24　　Defendant also testified about his video-recorded conversation with Cervantes at the police station. Defendant stated that certain parts of the conversation were in Spanish street slang that was translated incorrectly. In the video, defendant used the slang word "plomie," which meant "I shot him" but was translated as "filled him up with lead." Also translated incorrectly was the phrase, "I let him have it four or five times." When defendant told Cervantes he did a "f*** job," it should have been translated as defendant saying that he shot somebody. "I let him have it, dude," should also have been translated as, "I shot somebody." Defendant did not recall saying, "I let him have it like four or five dude, hey dude."

¶ 25　　In closing, the State asserted in part that defendant's testimony was contradicted by the evidence. The State noted that neither Santiago, Glassco, nor Diosdado saw Cage slap, hit, or threaten defendant. The State also contended:

> "And that video that you saw of him in the lock-up. He wasn't telling his friend 'I shot him. I shot him. He was coming at me. I was scared. I had to do it.' Did you hear that up there? No. He was saying, 'we had a f*** job, Dude. I did. I filled a guy with lead, close range. When I tried to fill him up with lead again, I didn't have anymore, Dude. I let him have it, four or five, Dude.' He had two years to come up with that story that you heard on the stand."

¶ 26　　In his closing, defense counsel asserted that defendant acted in self-defense. Defense counsel further stated that it was not necessary for the other person to "have had a gun or knife or stick." Defendant was in fear of Cage, who outweighed defendant by 100 pounds and was six inches taller than him. Defense counsel also challenged Diosdado's testimony, stating that she did not see the interaction between defendant and Cage. Defense counsel further contended that Diosdado was lying and Davila was in the car the entire time. Moreover, the State failed to call Davila and Cervantes to testify. Defense counsel also stated that the jury would be given a second degree murder instruction if it believed defendant acted unreasonably in firing the weapon.

¶ 27　　In rebuttal, the State asserted in part that missing from defendant and Cervantes's conversation was "[t]he whole part about self-defense, the whole part about Brandon Cage slapping him in the head and telling him to get off his block. It's not there because it didn't happen that way."

¶ 28　　After closing arguments, the court instructed the jury on first degree murder, second degree murder, and self-defense, among other topics. The following oral instruction was given about the DVD:

> "A tape-recording has been admitted into evidence. In addition to the tape-recording you've been given[4] a transcript of the tape-recording. The transcript only represents what the transcriber believes was said on the tape, and merely serves as an aid when you listen to the tape. The tape and not the transcript is the evidence. If you perceive a conflict between the tape and the transcript, the tape controls.

---

[4]The court's written instruction to the jury stated that "you are being given" a transcript of the recording.

The tape recording and transcript also include statements made by individuals other than the defendant. Those statements are admitted to provide context for the defendant's statements and are not admitted for the truth of the matter asserted therein."

The court had earlier confirmed with the parties that the transcripts would not go back to the jury room.

¶ 29 After deliberating, the jury found defendant guilty of first degree murder and found that during the commission of the offense, defendant personally discharged a firearm that proximately caused the death of another individual.

¶ 30 Defendant filed a motion for a new trial, contending in part that the court should have granted his motion *in limine* to exclude Cervantes' statements from the video. Defendant stated that in the video, Cervantes repeatedly made statements such as, "You always take things too far." Defendant continued that because he raised self-defense at trial, the reasonableness of his actions was directly at issue. Further, Cervantes's comments on past acts were irrelevant, inadmissible, and highly prejudicial. At the hearing on defendant's motion, the State asserted that Cervantes's words added context to the conversation. The State also noted that the jury was given a limiting instruction that Cervantes's statements were not evidence and instead were context for defendant's statements or conversation. Ultimately, the court denied the motion for a new trial. In part, the court found that *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Escobedo v. Illinois*, 378 U.S. 478 (1964), did not apply as Cervantes was a co-arrestee. The court further found that "it was an admission by silence for not addressing what the other individual was saying."

¶ 31 After a sentencing hearing, defendant was sentenced to 51 years in prison, which included a 25-year firearm enhancement. Defendant was given credit for 748 days in presentence custody.

¶ 32                                    II. ANALYSIS

¶ 33 On appeal, defendant contends that the trial court erred by allowing into evidence certain statements made by Cervantes in the video as tacit admissions. Defendant argues that the court should have excluded the statement that defendant had gone "too far" and the numerous statements about "you guys" taking things "too far." Defendant asserts that the tacit admission rule is flawed and at a minimum should not apply here because defendant was in police custody when the statements were made.

¶ 34 We generally review the trial court's admission of evidence for an abuse of discretion. *People v. Randolph*, 2014 IL App (1st) 113624, ¶ 16. A court abuses its discretion "only if the decision was arbitrary, fanciful, or unreasonable, or no reasonable person would agree with it." *Id.* However, "to the extent that admissibility of evidence requires the interpretation of a rule and its intended scope, our review is *de novo*." *People v. Colon*, 2018 IL App (1st) 160120, ¶ 12 (citing *People v. Romanowski*, 2016 IL App (1st) 142360, ¶ 21).

¶ 35 Under the tacit admission rule, a defendant's silence may be introduced as a tacit or implied admission of guilt if the defendant remains silent in the face of an accusation of criminal conduct. *People v. Sneed*, 274 Ill. App. 3d 287, 295 (1995). When an incriminating statement is made in the presence and hearing of an accused and the statement is not denied, contradicted, or objected to, both the statement and the failure to deny it are admissible at trial

as evidence of the accused's acquiescence in its truth. *People v. Childrous*, 196 Ill. App. 3d 38, 53 (1990). For the statement to be admitted, the following elements must be met: (1) the defendant heard the accusative statement, (2) the defendant had an opportunity to reply and remained silent, and (3) the accusation was such that the natural reaction of an innocent person would be to deny it. *People v. Goswami*, 237 Ill. App. 3d 532, 536 (1992). The statement does not need to be made in an accusatory tone as long as it is evident that the defendant "was being painted or portrayed as a participant in illegal and prohibited activity." *People v. Miller*, 128 Ill. App. 3d 574, 584 (1984). Further, "[a]cquiescence or assent may be manifested by silence or by an evasive, equivocal, or unresponsive reply." *Childrous*, 196 Ill. App. 3d at 53.

¶ 36    As defendant notes, several jurisdictions have rejected the tacit admission rule. See, *e.g.*, *Jarrett v. State*, 453 S.E.2d 461, 463 (Ga. 1995) (witness in a criminal trial may not testify as to declarant's statements based on the acquiescence or silence of the accused); *Ex Parte Marek*, 556 So. 2d 375, 382 (Ala. 1989) ("[t]he tacit admission rule *** is hereby abolished"); *Commonwealth v. Dravecz*, 227 A.2d 904, 906 (Pa. 1967) (tacit admission rule is untenable). However, the tacit admission rule is valid in Illinois. See *e.g.*, *Colon*, 2018 IL App (1st) 160120, ¶ 17; *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 67; *People v. Campbell*, 332 Ill. App. 3d 721, 733 (2002); *Sneed*, 274 Ill. App. 3d at 295; *Goswami*, 237 Ill. App. 3d at 536; *Childrous*, 196 Ill. App. 3d at 53; see also Ill. R. Evid. 801(d)(2)(B) (eff. Jan. 1, 2011). We may neither "ignore an entire body of relevant case law and the principles and guidelines articulated therein" (*People v. Luedemann*, 222 Ill. 2d 530, 552 (2006)) nor overrule or ignore a supreme court rule. We decline defendant's invitation to dispose of the tacit admission rule.

¶ 37    Still, the tacit admission rule should not have been applied here to admit Cervantes's statements about defendant and "you guys" taking things "too far" and defendant's failure to deny those statements. It has been noted that tacit admissions should be "received with caution." 2 Kenneth S. Broun *et al.*, McCormick on Evidence § 262, at 305 (7th ed. 2013) (hereinafter McCormick on Evidence). Concerns with tacit admissions include the " 'inherently ambiguous nature of the inference itself' " (*People v. Powell*, 301 Ill. App. 3d 272, 278 (1998) (quoting Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 802.7, at 679-80 (6th ed. 1994))), and that silence could be "motivated by many factors other than a sense of guilt or lack of an exculpatory story" (McCormick on Evidence § 262, at 306), such as "prior experience or the advice of counsel" (*Powell*, 301 Ill. App. 3d at 278). The tacit admission rule appears to be on particularly shaky ground when a defendant is in police custody and knows the police can hear his conversation, as in *People v. Soto*, 342 Ill. App. 3d 1005 (2003). In *Soto*, the court considered the admissibility of statements made by the defendant and a co-arrestee while they were in separate cells at a police station. *Id.* at 1010-11. An officer told the defendant and the co-arrestee that she could hear what they were saying when she was not in the room and their conversations were being monitored. *Id.* at 1011. Also, it could be inferred that the defendant believed the police could hear his conversation because he and his co-arrestee were shouting across the cell area and one of the men stated " 'they' " could hear what was being said. *Id.* at 1013. The court found that the defendant's reactions to the co-arrestee's statements were not tacit admissions because the defendant "did not have an unencumbered choice to speak up and deny the statements," as he was under arrest and in police custody. *Id.* Under the "unique" circumstances, it could not "reasonably be expected that [the] defendant would feel free to respond" to his co-arrestee's comments. *Id.*

¶ 38    The many similarities of this case with the circumstances in *Soto* persuade this court that the statements by Cervantes that defendant and "you guys" take things "too far" and defendant's failure to deny those statements should not have qualified as tacit admissions. Like the defendant in *Soto*, defendant here was under arrest and in a room at a police station. Further, defendant knew that an officer could hear him because he called for an officer multiple times while he spoke with Cervantes. Indeed, one of the times when Cervantes told defendant "you guys take things to [*sic*] far," happened when defendant was escorted by an officer out of the room so he could use the bathroom. "[T]he fact that the police are present when an accusatory statement is made may constitute a critical circumstance that eliminates the naturalness of a response." McCormick on Evidence § 262, at 308. And, many arrested people know, even without *Miranda* warnings, "that silence is usually golden." *United States v. Flecha*, 539 F.2d 874, 877 (2d Cir. 1976). As in *Soto*, we cannot find that defendant here had an "unencumbered choice to speak up and deny the statements." *Soto*, 342 Ill. App. 3d at 1013.

¶ 39    The State asserts that defendant's "freewheeling and profane" conversation dispels any concern that he was restrained from speaking. Yet, we cannot determine the exact nature of defendant's comments where the accuracy of the translation was disputed. Further, that defendant perhaps felt comfortable volunteering certain information does not necessarily mean that he felt comfortable responding to all of Cervantes's statements. We emphasize that our conclusion is limited to Cervantes's statements about defendant and "you guys" taking things "too far." Defendant does not argue on appeal that other statements he made in the recording should be excluded. We find that defendant's surroundings militate against applying the tacit admission rule to the specified statements made by Cervantes and defendant's failure to deny them. See *id.* at 1014 (statements and the defendant's reactions thereto did not qualify as tacit admissions).

¶ 40    The next question is whether the error in admitting defendant's reactions is reversible. Defendant states that the prosecutor relied on defendant's silence in closing argument. Defendant further contends that a limiting instruction about Cervantes's statements serving as context was only given at the end of trial and not when the video was first played. According to defendant, the belated instruction was insufficient to divest the jury of the damaging effect of Cervantes's statements. Defendant also argues that his credibility was crucial where he testified in his defense and the cumulative effect of Cervantes's accusations was to cause the jury to disbelieve defendant's self-defense testimony.

¶ 41    Defendant mischaracterizes the State's closing argument. The prosecutor did not specifically mention defendant's silence in the face of Cervantes's statements that defendant went "too far." Rather, the prosecutor asserted that defendant did not mention to Cervantes at all that he acted in self-defense, stating that in the video, defendant "wasn't telling his friend 'I shot him. I shot him. He was coming at me. I was scared. I had to do it.' Did you hear that up there? No." A similar comment was made in the State's rebuttal. The prosecutor mentioned defendant's silence as a general matter but did not highlight or rely on Cervantes's statements and defendant's reactions to them. Thus, the State's closing argument did not exacerbate the error in admitting Cervantes's statements. But see *People v. Jura*, 352 Ill. App. 3d 1080, 1090-91 (2004) (error in repeating hearsay description of suspect was exacerbated by the State explicitly reminding the jury in closing argument that the defendant matched the inadmissible hearsay description).

- 14 -

¶ 42    As for the limiting instruction, it was not perfectly given. Before the video was played at trial, the court told the jury that a provided transcript was not evidence and the only evidence was the video. No mention was made of how to consider Cervantes's statements until the end of trial, when the court instructed the jury that statements made by people other than defendant "are admitted to provide context for the defendant's statements and are not admitted for the truth of the matter asserted therein." The instruction was a modified version of Illinois Pattern Jury Instructions, Criminal, No. 3.20, in which the committee note states that "[t]he instruction should be given during the trial when a tape-recording or other form of recording is admitted." Illinois Pattern Jury Instructions, Criminal, No. 3.20, Committee Note (approved Oct. 17, 2014). The additional, modified portion about Cervantes's statements providing context was not given until after the jury had seen the video.

¶ 43    Even still, the imperfect limiting instruction does not require that we reverse. "Inadmissible hearsay does not require reversal where there is no reasonable probability the jury would have found the defendant not guilty had the hearsay been excluded." *People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 58 (engaging in harmless error analysis even though trial court did not provide a limiting instruction for improper hearsay evidence). We ask whether there is a reasonable probability that the jury would have acquitted defendant without Cervantes's statements that defendant or his associates went "too far." See *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 37 (when examining whether admission of hearsay was harmless, reviewing courts ask whether there is a reasonable probability that trier of fact would have acquitted the defendant if the hearsay had been excluded).

¶ 44    We conclude that there is no reasonable probability that the jury would have acquitted defendant if Cervantes's statements had been excluded. The State's witnesses provided a consistent version of the incident. Santiago testified that defendant approached the van and asked about Santiago's gang affiliation. Santiago then observed Cage encounter defendant, who asked about Cage's gang affiliation and then shot him three times. Santiago did not observe Cage make any physical contact with defendant and stated that Cage was not close enough to hit defendant if he tried. Glassco testified that a man on the driver's side of the van asked for Santiago's gang affiliation and then encountered Cage. After the man and Cage exchanged words about Cage's gang affiliation, the man shot Cage. Glassco could not identify the shooter, but she described the same series of events as Santiago. The State also presented the testimony of Diosdado, who was in defendant's car and whose account matched that of Santiago and Glassco. Diosdado testified that defendant approached a car and checked for the occupants' gang affiliations. Diosdado further stated that afterwards, defendant spoke to Cage about gang affiliations, whereupon she heard three or four shots. Diosdado stated that she did not see the interaction between defendant and Cage, but her version still supports the State's narrative. The State's evidence was overwhelming. Thus, the error in admitting Cervantes's statements was harmless. See *People v. Williams*, 228 Ill. App. 3d 981, 995 (1992) (error is harmless where there is overwhelming evidence from which jury could reasonably conclude that the defendant is guilty beyond a reasonable doubt).

¶ 45    Lastly, defendant contends, and the State concedes, that he is entitled to 749 days of presentence custody credit. Initially, the trial court gave defendant credit for 748 days. Under Illinois Supreme Court Rule 615(b) (eff. Jan. 1, 1967), we may correct the mittimus without remanding the case to the trial court. *People v. Pryor*, 372 Ill. App. 3d 422, 438 (2007). Thus, the mittimus shall be corrected to reflect that defendant is entitled to 749 days of presentence

custody credit.

¶ 46                                    III. CONCLUSION
¶ 47            For the foregoing reasons, the judgment is affirmed and the mittimus corrected.

¶ 48            Affirmed; mittimus corrected.