2022 IL App (2d) 210596-U
No. 2-21-0596
Order filed December 21, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12 CF 2046 |
| JOEL AUGUSTINE, | ) ) ) | Honorable Daniel P. Guerin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's actual-innocence claim, supported by the victim's statement during a phone conversation, was properly dismissed at the second stage of postconviction review. The statement was not, as defendant claims, a recantation of trial testimony or a tacit admission. Most importantly, the statement was not of such a conclusive character that it would probably change the result on retrial.

¶ 2    Defendant, Joel Augustine, appeals from the second-stage dismissal of his second amended petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). He contends that the trial court erred in dismissing his petition, because he made a substantial showing of actual innocence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      In November 2012, the State indicted defendant on three counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2012)), two counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2008)), and one count of child pornography (720 ILCS 5/11-20.1(a)(4), (c) (West 2012)). The victim was his girlfriend's daughter, D.J., who was 12 years old when the abuse began. The alleged abuse occurred over three years, beginning in late 2009 and continuing through October 2012. The abuse came to light only after L.H., D.J.'s friend, reported that defendant had molested L.H. during an August 2012 sleepover at D.J.'s home. The investigation into L.H.'s allegations led to the charges in this case as to D.J.

¶ 5      A jury trial took place in April 2014. Bonnie G. testified that she began dating defendant in December 2000. Eventually, defendant moved in with Bonnie and her two daughters, D.J., born September 3, 1997, and H.J., born October 13, 2000. Bonnie testified that they lived together for about nine or ten years until October 2015. Defendant was "like a stepdad" to her daughters and took care of them when she was at work. She usually worked from 3 to 11 p.m. every Sunday through Thursday. D.J. and H.J. also occasionally spent time with defendant's mother, Diane Augustine.

¶ 6      D.J. testified that she had known defendant for "[a]s long as [she] can remember" and that he was "like a dad" to her. He watched D.J. and H.J. while Bonnie was at work. Together they went grocery shopping, to family parties, and on vacations. She enjoyed going to defendant's family's events. She also spent time with Diane and liked staying at her house. She called her "Grandma Diane." She called defendant's father "Grandpa Dave."

¶ 7      D.J. testified that, sometime between September 2009 and December 2009, when she was 12 years old, defendant entered the bathroom while she was showering and asked her to step out.

When she did, defendant moved her legs apart and performed oral sex on her. D.J. started crying, and defendant stopped and told her to finish showering. After the first incident, defendant repeated the oral sex every time D.J. showered and Bonnie was not home. D.J. also testified that defendant occasionally touched her vagina with his finger while she was showering. D.J. described this as a sex "routine" where defendant would come to the bathroom while she showered and either use the toilet or try to converse with her. He would then leave. When she finished showering and was wearing a towel, he would make her go to a couch, his bedroom, or her bed. He would then open the towel and "lick [her] vagina or touch it." D.J. testified that the "routine" continued until October 2012, when she was 15. Defendant also touched D.J.'s vagina while sitting together under a blanket on the couch watching television. H.J. would sometimes be present while this was occurring.

¶ 8    D.J. testified that defendant threatened to "break [her] jaw if [she] told anyone" about the abuse. She testified that "he was really intimidating and he scared us." She further testified that "when he drank, he used to turn violent." Defendant would hit Bonnie and yell at D.J. and H.J. He would also "take away [their] phones and iPods and make [them] stand in the corner and sometimes he would hit [them] with his belt." Defendant would take D.J. shopping and let her buy clothes so that "[she] wouldn't tell [her] mom." He took her to Victoria's Secret "once every month or two" and "wanted [her] to pick out bras and underwear."

¶ 9    H.J. testified that she noticed inappropriate contact between defendant and D.J. beginning in October 2011. This contact occurred in the living room or the bedroom that she shared with D.J. In the living room, defendant would place his hand under a blanket to touch D.J.'s breast or "private area" while sitting on the couch. In the bedroom, defendant would climb under the covers with D.J. in her bed and place his head in D.J.'s "private area."

¶ 10    L.H. testified that, in August 2012, defendant molested her during a sleepover at D.J.'s house. During the sleepover, defendant placed his finger in her vagina on three separate occasions. L.H. did not tell her mom what had happened until October 2012. The investigation into L.H.'s allegations led to D.J. and H.J. being taken into protective custody and interviewed at the Du Page County Children's Advocacy Center. Investigator Boris Vrbos interviewed each girl while Investigator Taras Haliw observed from another room. Haliw also spoke with Bonnie.

¶ 11    After the interviews, defendant agreed to meet with Vrbos and Haliw. Haliw testified that, at the outset of the interview, defendant told them that he injured his back in an accident five years earlier. Defendant further stated that he could not afford pain medication, so he "substituted it with alcohol and *** had become a heavy drinker." Defendant told them that "he drank heavy amounts of alcohol every day." When they asked defendant about allegations by D.J. and H.J. that he had touched them inappropriately, defendant initially acted surprised and denied the allegations. Haliw testified that they asked him why the girls would fabricate such a story. Haliw described defendant's response:

> "He responded with, 'I don't believe that those girls would make up a story like that. They are really good girls. That if they saw something like that happened, it might have happened, but I just don't remember because I was drunk.' Something to that effect."

Haliw further testified that, when he and Vrbos told defendant that H.J. had witnessed defendant's mouth on D.J.'s vagina, defendant insisted that it happened only once. He said that it was "a complete accident" and "a bad mistake"—he had confused D.J. for Bonnie. He said he was drinking at the time.

¶ 12    After the interview, Haliw and Vrbos left the room and asked Roselle police detective Michael Marotta to keep an eye on defendant, who appeared agitated and nervous. Marotta

observed defendant clenching his fists, breathing heavily, and bouncing his forehead off the wall. Marotta testified that defendant started talking about his alcohol consumption and told Marotta "that he might have done what the investigators said he had done." When Marotta told defendant that he did not even know why defendant was there, defendant responded, "I might have molested my girlfriend's daughter and her friend but I'm unsure." When defendant was transferred to the booking area, Marotta heard him repeatedly say he "might have done it."

¶ 13    When the police arrested defendant, they seized his mobile phone. Detective Thomas Brown testified that he recovered thousands of text messages from the phone. From July 4, 2012, to October 15, 2012, there were 2669 text messages between defendant's phone and D.J.'s device. Brown also recovered about 4000 photographic images, some of which were in the cache or thumbnail databases, not the default photograph location.

¶ 14    D.J. identified several photographs of herself recovered from defendant's phone. She testified that, when she was in eighth grade, defendant began asking her to take photographs of herself every day so that he could see what she was wearing to school. She would take a picture of herself and text it to defendant. D.J. also identified one photograph as a close-up of her underwear pulled aside and defendant's finger touching her vagina. She did not recall the photograph being taken and could not identify who took it. She also identified a photograph defendant took of her wearing only a bra and underwear.

¶ 15    D.J. identified transcripts of text messages between her mobile phone and defendant's mobile phone. She read the transcripts into the record. The content of the text messages generally established that defendant viewed D.J. as his love interest. For instance, defendant wrote " 'Man wish you were here. I would be kissing you all over.' " He also referred to D.J. as " 'my love.' " D.J. interpreted several texts as references to the sex "routine." These included defendant's texts

(1) that D.J. would have a chance to "prove" that she loved him, (2) that she should "do like [she] was] supposed to do when [she] come[s] home," and (3) that she "better try harder tonight than [she] did last night."

¶ 16    Several family members testified on behalf of defendant, including his parents, aunt, and two cousins. Their testimony generally established that they have often spent time together as a family with defendant and D.J. and never saw any inappropriate behavior between them. Defendant's father testified that defendant and D.J. had a typical father-daughter relationship. Defendant's father also described defendant as "a mean drunk." Defendant's cousin described D.J. as affectionate towards defendant. Defendant's aunt testified that defendant and D.J. "looked like a little happy family." Seventeen-year-old S.W., defendant's cousin, testified that she was close with D.J. She testified that D.J. "acted like [defendant] was her dad." S.W. also testified that "[D.J.] lies" and that she would not believe D.J. even under oath. Diane testified that she spent a lot of time with D.J. and H.J. and was close to them. D.J. never said anything to her about defendant abusing her. Diane also testified that "whenever [defendant] drinks, he gets mean."

¶ 17    The jury found defendant guilty on all six counts, and the trial court denied his various posttrial motions. In October 2014, the trial court sentenced him to an aggregate prison term of 35 years.

¶ 18    Defendant appealed his conviction. He contended that the trial court made several evidentiary errors warranting a new trial and that the court erred in denying defendant's motion for a bill of particulars. We affirmed. *People v. Augustine*, 2016 IL App (2d) 141158-U.

¶ 19    Defendant retained postconviction counsel and, on August 23, 2017, filed a postconviction petition under the Act. He filed a first amended petition on February 20, 2018, and a second amended petition on January 19, 2021. The trial court advanced the petition to the second stage.

¶ 20    In his second amended petition, defendant claimed, among other things, that he had newly discovered evidence of actual innocence. This evidence was a January 2022 affidavit from Diane averring that, "[n]ot long after [defendant] was sent to prison, [her] other son received a call from [D.J.]," which Diane overheard. During the call, "[her] son accused [D.J.] of lying about [defendant's] alleged crimes." According to Diane, "[D.J.] did not deny lying but claimed that [defendant] 'wanted to' everyday [*sic*] of her life."

¶ 21    The State moved to dismiss the petition. As to defendant's claim of actual innocence, the State argued that D.J. did not fail to deny the allegation that she lied. According to the State, D.J.'s comment that defendant " 'wanted to' everyday [*sic*] of her life," could be interpreted as confirmation of her accusations of abuse. The State also argued that the evidence was not newly discovered, given that the phone conversation occurred "not long after [d]efendant was sent to prison" in 2014. Thus, the State maintained that the evidence was available "if [d]efendant had shown any diligence in the past seven years." Finally, the State argued that the evidence was not of such a conclusive character that it would have changed the result at trial.

¶ 22    The trial court granted the State's motion to dismiss after a hearing. As to defendant's claim of actual innocence, the court held "that there ha[d] not been the requisite showing for the claim of actual innocence." More specifically, the court found that the evidence was not "of such a conclusive nature that it would probably change the result[ ] on retrial."

¶ 23    This timely appeal followed.

¶ 24                                II. ANALYSIS

¶ 25    Defendant contends that he made a substantial showing of actual innocence to warrant a third-stage postconviction evidentiary hearing. He argues that the import of Diane's proposed testimony is "that D.J. had failed to deny a direct accusation of perjury." According to defendant,

the evidence was (1) newly discovered because it was unavailable at the time of trial, (2) material because D.J.'s testimony "was the linchpin of [defendant's] convictions," and (3) noncumulative because it contradicted D.J.'s trial testimony.

¶ 26    "The Act provides a mechanism by which criminal defendants may assert that their convictions or sentences were the result of a substantial violation of their constitutional rights." *People v. Rosalez*, 2021 IL App (2d) 200086, ¶ 89. A postconviction proceeding is not a substitute for a direct appeal. *Id.* Rather, it allows the defendant to assert a collateral attack on the final judgment. *Id.*

¶ 27    "The Act provides for a three-stage proceeding, and a defendant must satisfy the requirements of each before continuing to the next stage." *Id.* ¶ 90. At the first stage, the trial court is afforded 90 days to review the petition without input from the State. *Id.* (citing 725 ILCS 5/122-2.1(a)(2) (West 2016)). "The petition must present the gist of a constitutional claim, and the petition will survive [the first stage] so long as it is not frivolous or patently without merit." *Id.*

¶ 28    At the second stage, the trial court may appoint counsel for an indigent defendant. *Id.* ¶ 91 (citing 725 ILCS 5/122-4 (West 2016)). "After counsel has made any necessary amendments to the defendant's claims, the State may move to dismiss or may answer the petition." *Id.* (citing 725 ILCS 5/122-5 (West 2016)). "The petition and any accompanying documentation must make a substantial showing of a constitutional violation." *Id.* "All well-pleaded facts that are not positively rebutted by the record are taken as true." *Id.*

¶ 29    "Finally, at the third stage, the trial court conducts an evidentiary hearing to determine whether a new trial is warranted." *Id.* ¶ 92. The court makes fact-finding and credibility determinations. *Id.* "The defendant must again make a substantial showing of a constitutional violation." *Id.*

¶ 30    Here, defendant retained counsel at the first stage of the postconviction proceedings. The petition advanced to the second stage, the State moved to dismiss it, and the trial court granted the State's motion. Under those circumstances, our review is *de novo*. *Id.* ¶ 93.

¶ 31    "A freestanding claim of actual innocence is cognizable under the Act." *Id.* ¶ 95. "In a freestanding claim of actual innocence, the defendant asserts that he is 'innocent of the crime for which he has been tried, convicted, and sentenced.' " *Id.* (quoting *People v. Harris*, 206 Ill. 2d 293, 301 (2002)). "For a freestanding claim of actual innocence to survive the second stage, the petition and supporting documents must make a substantial showing that the evidence supporting actual innocence is (1) newly discovered, (2) material and not merely cumulative, and (3) of a conclusive character." *Id.*

¶ 32    Evidence is conclusive when, considered along with the trial evidence, it would probably lead to a different result. *Id.* ¶ 133. "The new evidence need not be completely dispositive." *Id.* Our supreme court rejected a "total vindication or exoneration" standard in *Robinson*. *Id.* ¶ 148 (citing *Robinson*, 2020 IL 123849, ¶ 55). "Rather, '[p]robability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together.' " *Id.* ¶ 133 (quoting *People v. Coleman*, 2013 IL 113307, ¶ 97). "The question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* (citing *Robinson*, 2020 IL 123849, ¶ 48).

¶ 33    Here, although defendant accurately recites all elements of an actual-innocence claim, he argues only that the evidence is (1) newly discovered, (2) material, and (3) noncumulative. He makes no express argument as to the conclusive nature of the evidence. This is curious, especially since the conclusiveness element was the basis of the trial court's dismissal of his actual-innocence

claim and, moreover, is the most important element of an actual-innocence claim. See *People v. Washington*, 171 Ill. 2d 475, 489 (1996). In any event, we agree with the trial court's conclusion that the evidence was not conclusive.

¶ 34    We first note that defendant seems to suggest that the evidence qualifies as a recantation. Without any elaboration, defendant states that "recantations can be considered newly discovered evidence sufficient to grant relief." He cites *People v. Harper*, 2013 IL App (1st) 102181, ¶ 42 (affidavit from the manager of the gas station where the crime occurred, attesting that his testimony at the defendant's trial was coerced by the police, met the conclusiveness element of the defendant's actual-innocence claim because the strongest evidence against the defendant was his own confession, which he too claimed was coerced). We do not quarrel with the general proposition that a recantation might well be sufficient to support an actual-innocence claim. However, D.J.'s statement as reported through Diane does not rise to the level of a recantation.

¶ 35    Defendant also characterizes the evidence as a "tacit admission" and asserts by analogy that "the failure by a defendant to deny an accusation can be considered an admission."

> "Under the tacit admission rule, a defendant's silence may be introduced as a tacit or implied admission of guilt if the defendant remains silent in the face of an accusation of criminal conduct. [Citation.] When an incriminating statement is made in the presence and hearing of an accused and the statement is not denied, contradicted, or objected to, both the statement and the failure to deny it are admissible at trial as evidence of the accused's acquiescence in its truth. [Citation.] For the statement to be admitted, the following elements must be met: (1) the defendant heard the accusative statement, (2) the defendant had an opportunity to reply and remained silent, and (3) the accusation was such that the

natural reaction of an innocent person would be to deny it. [Citation.]" *People v. Ruiz*, 2019 IL App (1st) 152157, ¶ 35.

D.J.'s reaction cannot be interpreted as an acquiescence in defendant's brother's allegation that she lied about defendant's crimes. She did not remain silent in the face of the allegation but responded that "[defendant] 'wanted to' everyday [*sic*] of her life."

¶ 36　　Moreover, D.J.'s response, though vague, was consistent with her testimony that defendant approached her whenever she showered and Bonnie was not home. When considered alongside the evidence presented at trial, Diane's affidavit does not raise the probability that a different jury would reach a different conclusion. At trial, D.J. testified in detail to defendant's routine sexual abuse over three years. The numerous text messages between defendant and D.J. and the images of D.J. retrieved from defendant's telephone confirmed an inappropriate relationship between D.J. and defendant. H.J. testified that she witnessed inappropriate behavior between defendant and D.J. In addition, when investigators told defendant that H.J. had witnessed defendant's mouth on D.J.'s vagina, defendant admitted the conduct. However, he insisted it was an isolated mistake that occurred when he confused D.J. for Bonnie. Marotta testified that defendant told him "that he might have done what the investigators said he had done." Defendant also told Marotta, "I might have molested my girlfriend's daughter and her friend but I'm unsure." Marotta also heard defendant repeatedly say he "might have done it." Furthermore, L.H. testified that she was also sexually assaulted by defendant while in D.J.'s home. Thus, given the compelling evidence at trial, Diane's affidavit is not of such a conclusive character that it would probably change the result on retrial.

¶ 37　　　　　　　　　　　　III. CONCLUSION

¶ 38     For the reasons stated, we agree with the trial court that defendant did not make a substantial showing of actual innocence. Thus, we affirm the judgment of the circuit court of Du Page County dismissing defendant's postconviction petition at the second stage.

¶ 39     Affirmed.