2023 IL App (1st) 210541-U

No. 1-21-0541

Order filed February 24, 2023

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 13196 |
| | ) | |
| ABEL RUIZ, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Delort and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the summary dismissal of defendant's *pro se* postconviction petition where defendant did not state an arguable claim that appellate counsel was ineffective in failing to argue that the trial court's noncompliance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) was plain error.

¶ 2    Defendant Abel Ruiz appeals from the circuit court's order summarily dismissing his *pro se* petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122 *et seq.* (West 2020)). On appeal, defendant argues that counsel on direct appeal was ineffective in failing to argue that

the trial court's failure to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) was plain error. We affirm.

¶ 3 Following a jury trial, defendant was found guilty of first degree murder for shooting and killing Brandon Cage on June 12, 2013, in Chicago, and sentenced to 51 years' imprisonment. At trial, defendant testified he shot Cage in self-defense.

¶ 4 On direct appeal, defendant argued that the trial court erred in denying his motions (1) to suppress his post-arrest communications with another arrestee, Steve Cervantes, which were recorded while both were in custody, and (2) to exclude these communications at trial. We affirmed, but corrected the mittimus concerning sentencing credit. *People v. Ruiz*, 2019 IL App (1st) 152157.

¶ 5 Defendant filed a *pro se* postconviction petition on July 21, 2020. Defendant argued, *inter alia*, that the trial court failed to properly admonish the jury under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and counsel on direct appeal was ineffective for failing to raise the argument.

¶ 6 Relevant to defendant's claim, the report of proceedings reflects that, during jury selection, the trial court advised the venire that a defendant is "presumed to be innocent" and that this presumption "is not overcome unless from all the evidence in this case" the jury is "convinced beyond a reasonable doubt that the defendant is guilty." The trial court further noted that the State bears the burden of proving the defendant's guilt beyond a reasonable doubt and that the defendant "is not required to present any evidence on his own behalf," but "may rely upon the presumption of innocence." The following exchange then occurred:

"THE COURT: Ladies and gentlemen, **\*\*\*** I want to discuss some basis [*sic*] principles of constitutional law that apply to all criminal cases. First off, anybody that's placed on trial in a criminal case is presumed to be innocent of the charges against him. As I stated earlier, [defendant] is not required to present any evidence on his own behalf, and he may rely upon the presumption of innocence.

Does anybody have any qualms or problems understanding that constitutional principle of presumed innocent? Please raise your hand.

Could you stand up.

UNIDENTIFIED PERSON: Is he charged with two murders or one?

THE COURT: He's charged in two ways with one murder.

UNIDENTIFIED PERSON: Oh.

THE COURT: Does anybody have any problems understanding the presumption of innocence? Please raise your hand. Let the record indicate no one raised their hand."

¶ 7     The court then asked the venire whether anyone had "any problems applying or qualms about applying the presumption of innocence," and again indicated no hands were raised.

¶ 8     Next, the trial court addressed the applicable burden of proof, noting that the preponderance of evidence standard applies in civil cases, "[b]ut in a criminal case, the burden of proof is proof beyond a reasonable doubt, and this is the highest burden of proof at law." The court asked, as separate questions, whether anyone had "any problems understanding" the burden of proof in a criminal case or had "any problems \*\*\* or qualms about applying that principle," and to raise their hand if they did After each question, the court indicated no one raised a hand.

¶ 9    The trial court next told the venire that the burden of proof beyond a reasonable doubt remains with the State throughout the case. The court again asked, separately, whether anyone had "any problems understanding that principle" or "any problems about applying that principle," and after each question indicated no hands were raised.

¶ 10    Next, the trial court informed the venire that, if defendant were to testify, the jury should "judge his credibility like any other witness." The court asked whether anyone had any problems understanding, or problems or qualms about applying that principle, and after each question indicated no hands were raised.

¶ 11    Finally, the trial court addressed the venire as follows:

"THE COURT: Now, if you look at that as a constitutional coin and turn it over, [defendant] does have a constitutional right not to testify, and if he decides not to testify, no inference can be drawn from his silence.

Does anybody have any problems understanding that constitutional principle? Please raise your hand.

Indicating no one raised their hand.

Does anybody have any problem applying that constitutional principle or qualms about applying that constitutional principle? Please raise your hand.

Indicating no one raised their hand.

Thank you, ladies and gentlemen."

¶ 12    At trial, the State called Joseph Santiago, Amber Glassco, and Kristina Diosdado, who were present during the shooting.

¶ 13    Santiago testified that a misdemeanor DUI charge was pending against him and that he had been convicted of misdemeanor theft. On June 12, 2013, he and his girlfriend, Glassco, were at his house drinking with friends. Both wanted cocaine. At about 1 a.m., they drove Santiago's van to Cage's home, because Cage knew someone who sold cocaine. From there, Santiago drove Glassco and Cage to 60th Street and Homan Avenue. Cage went to the spot "where he would normally get cocaine" while Santiago and Glassco remained in the van with the windows down.

¶ 14    Santiago saw a dark Ford Taurus drive by and heard someone say, "Ho, ho, ho. Hold up. Hold up." The Taurus stopped, and defendant exited the back seat; he had a "shag" haircut. He drew a firearm, approached Santiago's open window, put the firearm to Santiago's head, and asked, "What are you?" Santiago, intending to convey that he was not a gang member, replied, "Nothing." Defendant told Santiago to "drop the forks"—an order to make a gang-related hand signal—and Santiago complied. Defendant said, "You're lucky. I would have killed your a***. You're lucky your girlfriend's here."

¶ 15    Defendant walked back to the Taurus. Cage stood about 10 feet from defendant and said, "What's up?" Defendant asked, "Well, what you is?" Cage replied, "GD Folks." Defendant walked toward Cage, shot him three times, and ran to the back passenger seat of the Taurus, which left the area. Santiago told Glassco to call 911. After speaking with the officers who arrived at the scene, Santiago entered the back seat of a police vehicle, viewed defendant in a show-up, and identified him as the shooter. Santiago testified that, before the shooting, Cage did not make physical contact with defendant, try to strike him, or make threatening comments to him. Cage stood too far from defendant to hit him, and was unarmed.

¶ 16    Glassco testified that, shortly after midnight on June 12, 2013, she and Santiago were at home drinking. Around 1 a.m., they drove to Cage's house in their van, picked him up, and drove to 60th and Homan to buy drugs. Glassco and Santiago stayed in the van while Cage went to make the buy. Someone near the driver's side of the vehicle asked Santiago "what he was." Although Glassco's view of the man's face was blocked by Santiago, she saw that the bottom part of his hair was long. The man told Santiago to "[d]rop the forks." After Santiago complied, the man told Santiago that he was lucky that Glassco was beside him because the man would have shot Santiago otherwise.

¶ 17    As the man walked to a dark Ford Taurus that was in front of the van, Cage returned and said, "What's up? Folks." The man asked what Cage was. After Cage replied, "I'm GD," the man shot Cage. Glassco heard three shots. Cage fell, and the man ran to the Taurus, which was then driven away. Glassco called 911. Glassco did not see Cage with a weapon and did not see Cage threaten or hit the man.

¶ 18    On cross-examination, Glassco stated that she could not see the man's body, face, and hands when he approached the van. She did not identify the shooter in a show-up at the scene or in a subsequent lineup at the police station.

¶ 19    Diosdado testified that on June 11, 2013, she spent the day at the beach with defendant, Andres Davila, and Cervantes, who was her boyfriend.[1] Later, Diosdado, Cervantes, and Davila drove to defendant's house. Cervantes became intoxicated and fell asleep. After a few hours, Diosdado entered a dark green Ford Taurus, driving Cervantes, who sat in the front passenger seat,

_____
[1] Diosdado referred to Davila as "Andrew" and "Tiny." On cross-examination, defense counsel referred to Davila as Andres Davila.

and defendant, who sat in the back passenger seat. She intended to take Cervantes home. Near 60th and Homan, defendant asked her to stop; she complied, and he exited the vehicle. A van was behind them. In the rearview mirror, Diosdado saw defendant approach the driver's side of the van. Through the open windows of the Taurus, she heard defendant ask the van's occupants, a woman and a man, about their gang affiliations. Diosdado testified that defendant also spoke to Cage, whose name she did not know at the time. She heard defendant say, "King love," and heard Cage say, "I'm Folks." She then heard three or four shots. She did not see Cage punch or swing at defendant. She did not hear anyone say, "I'll smoke you" or "take your things." Defendant returned to the Taurus and told Diosdado to "go." She saw a handgun on defendant's lap. She drove around and saw Davila, who jumped into the Taurus. A few blocks later, the police curbed the Taurus.

¶ 20    On cross-examination, Diosdado admitted that she did not see what occurred between defendant and Cage and did not know whether Cage struck defendant.

¶ 21    Officer Filiberto Rosas testified that, after monitoring a call around 1:25 a.m. on June 12, 2013, he curbed a vehicle and observed defendant in the back seat. Upon a search, a firearm was recovered from beneath the front passenger seat.

¶ 22    Ellen Chapman, a forensic scientist for the Illinois State Police, testified that analysis of a gunshot residue collection kit administered to defendant revealed sufficient particles from both of his hands to conclude that he had discharged a firearm, had contacted a gunshot residue-related item, or had been in the environment of a discharged firearm. The State entered a stipulation that Dr. James Filkins performed Cage's autopsy and would have testified that Cage was 5 feet, 11 inches tall, weighed 254 pounds, and had three gunshot wounds to his abdomen and chest. The cause of death was multiple gunshot wounds, and the manner of death was homicide.

¶ 23    Chicago police detective Michael Jackson testified that defendant, Diosdado, Cervantes, and Davila were taken to a police station and placed in separate areas, each of which had video surveillance. At one point, Jackson was informed that people in the areas were yelling and conversing in Spanish.

¶ 24    The State entered a stipulation between the parties that, if called, Chicago police officer Raul Cortez would have testified that he was fluent in English and Spanish. On June 12, 2013, Cortez listened to a conversation between defendant and Cervantes in Spanish, which was filmed and translated to English. Cortez watched the recording, which accurately represented the conversation, and read the English translation, which was true and accurate. The State entered the DVD recording into evidence, the court overruling the defense objection that the recording contained hearsay statements by Cervantes. A transcript of the DVD was provided to the members of the jury as demonstrative evidence. Before the DVD was played, the court instructed the jury that only the video was evidence, the transcript was provided only to aid in watching the video, and the jury would not receive the transcript during deliberations. The DVD, but not the transcript, was admitted into evidence, and contained the following conversation between defendant and Cervantes[2]:

> "CERVANTES: What happened?
>
> DEFENDANT: We did a f*** job, dude.

---

[2] The DVD is not included in the record on appeal. In our order on direct appeal, we noted that, as the written transcript given to the jury was not in the record, the excerpts of the DVD quoted in our order were derived from a transcript, prepared by defendant's appellate counsel, of the captions included in the video recording. *Ruiz*, 2019 IL App (1st) 152157, ¶ 20 n.3. The State agreed that this transcript accurately reflected the captions at the bottom of the video recording. *Id.* The record for the instant appeal contains neither the transcript given to the jury (which was not admitted into evidence) nor the transcript prepared by defendant's appellate counsel. Therefore, in this order, we incorporate excerpts from the latter transcript as quoted in our order on direct appeal.

CERVANTES: Who?

DEFENDANT: I did.

CERVANTES: Huh?

DEFENDANT: I did it.

\* \* \*

DEFENDANT: What the f\*\*\*, man? They got me handcuffed dog.

CERVANTES: What—what did they tell you?

DEFENDANT: Nothing that—that they are investigating, dude, but they found the f\*\*\* cannon in the car, dude.

CERVANTES: And who did they blame?

DEFENDANT: Nobody, dude. They just—they just took us, dude, but I told this guy run, dude, and the guy just put it under the car, dude.

CERVANTES: Who?

DEFENDANT: Tiny put the cannon under the seat. I told this guy to run, dude and guy didn't run. Hey!

\* \* \*

DEFENDANT: I caught—I caught an a\*\*\* over there, dude. I caught a f\*\*\*, dude.

CERVANTES: And what happened?

DEFENDANT: I let him have it, dude.

CERVANTES: But who is going to take the blame, dude?

DEFENDANT: Man, n***, this guy told me—he's all like, look when I told him to run he's all like, man, I'm going to say it's mine dude. That's what he told me.

* * *

DEFENDANT: That guy said he was going to take the blame, dude. I told this guy to run dude and the guy didn't run. I told him way before that they were going to stop us when—when we saw the cops I told him, get out dude and run dude. Just put it under the seat, dude. He said, I'm going to say that it's mine. That's what he told me, dog.

CERVANTES: But don't f*** around, dude. I'm here and also my lady.

* * *

CERVANTES: What—what was the f*** stupid fight about, dude.

DEFENDANT: Huh?

CERVANTES: What were all of you doing yesterday, dude?

DEFENDANT: Yesterday we went to eat, a***.

CERVANTES: And you filled him up with lead?

DEFENDANT: Hell yeah.

* * *

CERVANTES: Did they get the—the gun?

DEFENDANT: Yeah, n***, I told you—I told you what happened, dude. This idiot I told guy to run I told the guy to run, man and—and this guy said he put it under the seat and he said, I'm going to say it's mine. That's what he said, dog. I tellin' this n***, run dude, run your a*** off—run and this guy didn't want to, dude.

CERVANTES: F*** dumb guy. What happened, man?

DEFENDANT: I filled a guy with lead close range, n***.

CERVANTES: What?

DEFENDANT: Close range—I filled him with lead, dude. (Inaudible)—

* * *

CERVANTES: Hey dude.

DEFENDANT: Yeah.

CERVANTES: Did you see the f*** fall?

DEFENDANT: He fell, dude, in front of me, dude. And when I—and when I tried to fill him up with lead again I didn't have anymore, dude. I let him have like four or five, dude. Hey dude!

CERVANTES: Yes.

DEFENDANT: When you get out, dude, ask your old lady. She saw everything, dude."

¶ 25    Defendant testified that he had been convicted of armed robbery in 2008. On June 11, 2013, he, Davila, Cervantes, and Diosdado went to Lake Michigan and then to defendant's house, where they drank. Early on June 12, Cervantes became very intoxicated and passed out. Diosdado asked defendant for cocaine. Defendant did not know where to get cocaine. Davila made some phone calls in order to procure cocaine. All four of them left in Diosdado's car, with Diosdado driving and Davila directing her.

¶ 26    At 60th and Homan, Davila told defendant to buy the cocaine, said the seller would come via a gangway, and gave defendant a firearm, which defendant put in his waistband. Defendant walked toward the sidewalk, where he saw a black man whom he did not know at the time but

testified was Cage. Believing Cage to be the seller, defendant approached him. Cage said, "What up, Folks?" Defendant—a member of the Latin Kings and opposed to the Folks alliance— responded, "I ain't no m***f*** Folks." Cage asked, "Then what the f*** you doing in my hood, b***?" Defendant said he was there to meet somebody. Cage said, "You better take your a*** home before I take all your s*** and smoke your a***," words defendant interpreted as a threat to rob and kill him. Cage smacked defendant on the left side of his head. Defendant stepped back, and Cage approached defendant with closed fists. Defendant guarded his face with his arm, drew the firearm, and fired "back to back to back." Cage fell. Defendant testified that he fired the weapon because Cage's conduct put defendant in fear for his life. At the time, defendant was 5 feet, 5 inches tall and weighed around 135 pounds, and Cage was "bigger." After shooting Cage, defendant ran to Diosdado's car and returned the firearm to Davila. Defendant denied conversing with anyone in a van or seeing a van at the scene.

¶ 27    As to his recorded conversation with Cervantes, defendant disputed certain aspects of the translation. In the video, "plomie" was translated as "filled him up with lead," but, according to defendant, means "I shot him." Defendant testified that the statement "I let him have it four or five times" was also an incorrect translation. Defendant further asserted that his statements that he did a "f*** job" and "I let him have it, dude" should have been translated as "I shot somebody." Defendant did not recall saying, "I let him have it like four or five, dude."

¶ 28    In closing, defense counsel asserted that defendant acted in self-defense and feared for his life when he shot Cage. Defense counsel further stated that a finding that one acted in self-defense did not require that the other person "had a gun or knife or stick." Cage was six inches taller than

defendant and outweighed him by 100 pounds. Defense counsel also challenged Diosdado's credibility and noted that the State failed to call Davila and Cervantes.

¶ 29    In rebuttal, the State noted that defendant's videotaped conversation with Cervantes gave no indication of self-defense and contended that the cause of this omission was that "it didn't happen that way."

¶ 30    The jury found defendant guilty of first degree murder. The trial court denied defendant's motion for a new trial, in which he argued, *inter alia*, that the court should have granted his motion *in limine* to exclude Cervantes's statements from the video. After a hearing, defendant was sentenced to 51 years in prison, which included a 25-year firearm enhancement.

¶ 31    On direct appeal, defendant contended that the trial court erred by allowing into evidence certain statements made by Cervantes in the police station video recording as tacit admissions, and that the court should have excluded Cervantes's statements that defendant and others took matters "too far." This court agreed that Cervantes's statements at issue were impermissible hearsay and that the limiting instruction was imperfect, but affirmed. *Ruiz*, 2019 IL App (1st) 152157, ¶¶ 42-43, 48. We determined that the evidence presented against defendant was "overwhelming" and that no reasonable probability existed that the jury would have acquitted him but for the admission of Cervantes's statements; thus, their admission was harmless error. *Id.* ¶ 44.

¶ 32    Defendant filed his *pro se* postconviction petition on July 21, 2020. He argued, in relevant part, that the trial court failed to comply with Illinois Supreme Court Rule 431(b) by "conflat[ing]" the presumption of innocence with "the principle that defendant is not required to present evidence," and by failing to ask the venire persons whether they understood and accepted this principle. He contended that trial counsel failed to preserve this issue for appeal, and that appellate

counsel was ineffective in not raising the issue on direct appeal. Further, he contended that both he and the State's witnesses presented "plausible theories," rendering the evidence "close rather than overwhelming."

¶ 33    The circuit court, in a written order on October 8, 2020, summarily dismissed the petition as frivolous and patently without merit. The court concluded, in relevant part, that it adequately complied with Rule 431(b) in examining the venire and that defendant could not show prejudice from appellate counsel's failure to raise the issue on direct appeal.

¶ 34    On May 13, 2021, this court allowed defendant's motion for leave to file a late notice of appeal.[3]

¶ 35    In this appeal, defendant argues that the circuit court's summary dismissal of his postconviction petition was erroneous because counsel on direct appeal was ineffective for failing to argue that the trial court had not complied with Rule 431(b). Although defendant acknowledges that trial counsel failed to preserve the issue for direct appeal, defendant maintains that it is at least arguable that appellate counsel was ineffective in failing to raise the issue under the first prong of the plain error doctrine and that, had counsel done so, this court would have reversed defendant's conviction and remanded for a new trial.

¶ 36    The Act provides for three-stage postconviction proceedings to evaluate a defendant's claim of constitutional error in the original conviction and sentencing. *People v. English*, 2013 IL

---

[3] Defendant initially filed an untimely motion to reconsider the dismissal order of October 8, 2020, accompanied by a notice of appeal of the order and any denial of the motion to reconsider, on November 13, 2020, according to his certification of mailing. See 735 ILCS 5/1-109 (West 2020). The trial court denied the motion on December 9, 2020. Defendant's subsequent motion for leave to file a late notice of appeal from the October 8, 2020, order was timely filed on May 4, 2021. See Ill. S. Ct. R. 606(c) (eff. Mar. 12, 2021).

112890, ¶¶ 22-23. At the first stage—relevant to the present appeal—the circuit court, without input from the State, determines whether the defendant's petition is frivolous or patently without merit, such that summary dismissal is warranted. 725 ILCS 5/122-1(a-5), 122-2.1(a)(2) (West 2020). The circuit court may consider the court file, transcripts of the proceeding giving rise to the conviction, and any action taken by an appellate court. 725 ILCS 5/122-2.1(c) (West 2020).

¶ 37    Summary dismissal of a *pro se* petition is appropriate "only if the petition has no arguable basis either in law or in fact"—that is, when it is based on an indisputably meritless legal theory or fanciful factual allegation. *People v. Hodges*, 234 Ill. 2d 1, 11-12, 16 (2009). An indisputably meritless legal theory includes one that is completely contradicted by the record. *Id.* at 16. A petition lacks an arguable basis in fact when based on a fanciful factual allegation, such as one that is clearly baseless, fantastic, or delusional. *Id.* at 16-17. The circuit court must liberally construe *pro se* postconviction petitions at the first stage, viewing them " 'with a lenient eye, allowing borderline cases to proceed.' " *Id.* at 21 (quoting *Williams v. Kullman*, 722 F. 2d 1048, 1050 (2d Cir. 1983)). "At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *People v. Robinson*, 2020 IL 123849, ¶ 45. We review the summary dismissal of a postconviction petition *de novo. Hodges*, 234 Ill. 2d at 9.

¶ 38    The scope of postconviction proceedings is limited. "[I]ssues that could have been raised on direct appeal, but were not, are forfeited." *English*, 2013 IL 112890, ¶ 22. However, an exception to the rule of forfeiture may be recognized where fundamental fairness so requires, including where the forfeiture results from ineffective assistance of appellate counsel. *Id.*

¶ 39    As noted, defendant claims appellate counsel was ineffective in failing to raise, on direct appeal, the deficiency of the trial court's examination of the potential jurors under Rule 431(b). A claim of ineffective assistance of appellate counsel based on his or her failure to raise an issue requires the defendant to show that (1) counsel's failure to raise the issue rendered his performance deficient such that it fell below an objective standard of unreasonableness, and (2) the defendant was prejudiced on appeal in that the outcome would have differed had counsel not erred. See *People v. Childress*, 191 Ill. 2d 168, 175 (2000). Accordingly, prejudice can result from appellate counsel's failure to raise an argument only where such argument would have been successful had it been raised. *Id.* ("Unless the underlying issue is meritorious, petitioner suffered no prejudice from counsel's failure to raise it on direct appeal."). At the first stage of proceedings, a petition based on a claim of ineffective assistance need only show that (1) counsel's alleged failure *arguably* rendered his performance so deficient that it fell below an objective standard of reasonableness, and (2) the defendant was *arguably* prejudiced thereby. *People v. Hatter*, 2021 IL 125981, ¶ 25.

¶ 40    As defendant concedes, he forfeited review of the error he now alleges appellate counsel failed to raise—the trial court's failure to comply with Rule 431(b)—when trial counsel failed to object during *voir dire* and failed to include this issue in a posttrial motion. See *People v. Sebby*, 2017 IL 119445, ¶ 48. On direct appeal, this court may excuse a defendant's forfeiture under the "plain error" doctrine. *Id.*; see also Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967) ("Plain errors or defects affecting substantial rights may be noticed [on appeal] although they were not brought to the attention of the trial court."). The doctrine applies where a "clear or obvious error occurred" and either (1) " 'the evidence is so closely balanced that the error alone threatened to tip the scales of

justice against the defendant, regardless of the seriousness of the error,' " or (2) the error is " 'so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Gaines*, 2020 IL 125165, ¶ 18 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). The burden of persuasion lies with the defendant. *Gaines*, 2020 IL 125165, ¶ 18 (citing *People v. Thompson*, 238 Ill. 2d 598, 613 (2010)).

¶ 41 Here, defendant argues that only the first prong of the doctrine applies. Thus, at this stage, defendant must establish that appellate counsel's failure to claim that the trial court's Rule 431(b) admonitions constituted first-prong plain error rendered counsel's performance *arguably* deficient and that, had counsel raised the issue, defendant *arguably* would have prevailed on direct appeal. *Hatter*, 2021 IL 125981, ¶ 25. Mindful of these principles, we consider, first, whether the trial court's admonitions were constitutionally deficient under Rule 431(b), such that they constituted "clear or obvious error" for purposes of the plain error doctrine. See *Gaines*, 2020 IL 125165, ¶ 18. We find clear and obvious error.

¶ 42 Rule 431(b) requires the trial court to ask each potential juror, individually or in a group, whether that juror "understands and accepts" the following four principles:

"(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) *that the defendant is not required to offer any evidence on his or her own behalf*; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not

to testify when the defendant objects." (Emphasis added.) Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 43    Rule 431(b) is based on the four principles articulated by our supreme court in *People v. Zehr*, 103 Ill. 2d 472, 477 (1984). The rule imposes on trial courts an affirmative duty to ask the venirepersons, *sua sponte*, whether they understood and accepted the principles. *Birge*, 2021 IL 125644, ¶ 31. Thus, the rule's plain language "mandates a specific question and response process" between the trial court and potential jurors. *Thompson*, 238 Ill. 2d at 607. A trial court's failure to inquire regarding the potential jurors' understanding or acceptance of one or more of the principles of Rule 431(b) violates the rule. *Id.* Whether the trial court complied with Rule 431(b) is reviewed *de novo*. *People v. Wilmington*, 2013 IL 112938, ¶ 26.

¶ 44    Our review of the record shows that the trial court did not fully comply with Rule 431(b) with respect to the third principle. The trial court announced the first and third principles together, stating twice that a defendant "is not required to prove his innocence" nor "to present any evidence on his own behalf" (the third principle) and that he "may rely upon the presumption of innocence" (the first principle). The court asked the potential jurors repeatedly whether they had "qualms," "problems understanding," or "qualms about applying that constitutional principle of presumed innocent" and sought a show of hands. The trial court did not, however, ask the potential jurors whether they understood and accepted the third principle.

¶ 45    Our supreme court held in *Sebby* that a trial court's mere question to the potential jurors "whether they 'had any problems with' " or " ' believed in' " the four *Zehr* principles failed to sufficiently comply with the rule and constituted clear error. *Sebby*, 2017 IL 119445, ¶ 49. Rather, the rule "requires the trial court to ask potential jurors whether they understand and accept the four

*Zehr* principles." *Id.* ¶ 49. This ruling compels our finding that the trial court's failure to ask the venire whether it accepted and understood the third principle was clear error.

¶ 46    We reject the State's reliance on *People v. Birge*, 2021 IL 125644, and contention that the trial court merely, and permissibly, "conflated" the first and third principles of Rule 431(b) by stating them together. In *Birge*, the supreme court found Rule 431(b) satisfied where the trial court instructed the jury to " 'listen carefully as I will be asking if you understand these principles of law and if you accept [them]' "; read all four principles in the rule verbatim; and asked the following questions: " 'By a show of hands, do each of you *understand these principles of law*?' " and " 'Do each of you *accept these principles of law*?' " (Emphasis added.) *Id.* ¶¶ 4-6, 35.

¶ 47    In the case at bar, the trial court did not ascertain the jury's understanding and acceptance of all four principles simultaneously, as in *Birge*, but instead directed individual questions as to the first, second, and fourth principles, but not the third. Thus, *Birge* does not dissuade us from finding clear error in this case.

¶ 48    The State, citing *People v. Albarran*, 2018 IL App (1st) 151508, further argues that, regardless of whether the trial court erred in failing to question the potential jurors about the third *Zehr* principle, defendant cannot show "prejudice" because he offered evidence at trial. In *Albarran*, as here, the potential jurors were not asked whether they understood and accepted that a defendant is not required to offer evidence on his behalf. *Id.* ¶ 58. The defendant, who had not preserved the issue, sought first-prong plain error review on direct appeal. *Id.* ¶ 51. A panel of this court affirmed his conviction, finding, *inter alia*, that he had, in fact, offered evidence at trial. *Id.* ¶ 58. Reasoning that the defendant was required to show prejudice resulting from the court's error and that " '[w]hat makes an error prejudicial is the fact that it occurred in a close case *where its*

*impact on the result was potentially dispositive*,' " the appellate court concluded there was no possibility that the error affected the outcome of the trial. (Emphasis added.) *Id.* (quoting *Sebby*, 2017 IL 119445, ¶ 68).

¶ 49    Defendant, in his reply brief, contends we should decline to follow *Albarran* because it deviates from principles set forth in *Sebby*. In *Sebby*, our supreme court instructed that the finding of prejudice under the first prong of the plain error doctrine depends on "the closeness of the evidence," not on "the seriousness of the error." *Sebby*, 2017 IL 119445, ¶ 68. "Thus, whether a Rule 431(b) violation is trivial or *de minimis*—and we have repeatedly found it is neither—is simply the wrong inquiry." *Id.* ¶ 69. When a reviewing court finds the trial court erred in failing to comply with Rule 431(b), "[t]he only question" remaining under the first-prong inquiry "is whether the evidence is closely balanced." *Id.* Accordingly, here, defendant contends his presentation of evidence at trial should not preclude plain error relief.

¶ 50    Even accepting defendant's position that he may show "prejudice" under the first prong of the plain error doctrine even though he presented evidence at trial, we would not find he is entitled to relief because, in this case, the evidence was not closely balanced.

¶ 51    Defendant argues the trial evidence is closely balanced because "the case came down to a credibility contest between [defendant] and the State's witnesses" and thus he was "arguably prejudiced." Citing *Sebby* and *People v. Naylor*, 229 Ill. 2d 584 (2008), defendant claims that a credibility contest sufficient to establish that the evidence is closely balanced occurs when the State's witnesses and the defense witnesses testify to opposing versions of events, no extrinsic evidence corroborates or contradicts either version, and both versions are "credible" or not "fanciful." See *Sebby*, 2017 IL 119445, ¶ 61 (finding both accounts credible where "neither the

prosecution nor the defense accounts of **\*\*\*** events were fanciful"); *Naylor*, 229 Ill. 2d at 607 ("Given these opposing versions of events, and the fact that no extrinsic evidence was presented to corroborate or contradict either version, the trial court's finding of guilty necessarily involved the court's assessment of the credibility of the two [testifying] officers against that of defendant.").

¶ 52 However, *Naylor* and *Sebby* did not involve assertions by the defendant that he acted in self-defense, and are not otherwise factually analogous to this case. In *Sebby*, the defendant was charged with resisting a peace officer; three officers called by the State claimed he resisted arrest and injured an officer, whereas the defendant and other witnesses testified the *officers* manhandled *him*. *Sebby*, 2017 IL 119445, ¶¶ 27-36. The court noted that while "[m]inor inconsistencies clouded the testimony on both sides, \*\*\* neither the prosecution nor the defense accounts" of the events "were fanciful." *Id.* ¶ 61. The State's argument that the defendant's witnesses were biased was not dispositive, each side's version of events was internally consistent, and no extrinsic evidence corroborated either version. *Id.* ¶¶ 61-62.

¶ 53 In *Naylor*, the defendant was arrested along with several others during the chaos of a drug raid at an apartment complex. *Naylor*, 229 Ill. 2d at 590-91. Two officers testified that they encountered the defendant in the stairwell and that he sold them heroin, but the defendant testified that he had left his apartment to pick up his son from school when he was mistakenly apprehended during the raid. *Id.* at 588-91. The court found that the defendant's conviction turned on a "contest of credibility," in part because the defense's version of events was "consistent with much of the officers' testimony and the circumstances of his arrest." *Id.* at 606-07.

¶ 54 These cases are inapposite to the case at bar. "The evidence presented in a case is not deemed to be closely balanced merely because it turns on conflicting witness testimony." *People*

*v. Ammons*, 2021 IL App (3d) 150743, ¶ 60. Our review for first-prong plain error requires "a commonsense analysis of all the evidence in context" to determine whether it is "closely balanced." *People v. Belknap*, 2014 IL 117094, ¶ 50. The analysis also requires that we make a qualitative, rather than a quantitative, commonsense assessment of whether the evidence is closely balanced. *People v. White*, 2011 IL 109689, ¶ 139.

¶ 55    We find the evidence against defendant was not closely balanced, but rather, as we stated in our order on direct appeal, "overwhelming." Compare *Ruiz*, 2019 IL App (1st) 152157, ¶ 44, with *Piatkowski*, 225 Ill. 2d at 568 (noting evidence did not "*overwhelming*[*ly*] favor the State" and was "closely balanced" (emphasis added)). Here, there is no "contest" of credible but competing versions of events. Applying a commonsense analysis to the totality of the evidence, defendant's actions after the shooting do not credibly reflect that he acted in self-defense.

¶ 56    As we previously noted, "[t]he State's witnesses provided a consistent version of the incident." *Ruiz*, 2019 IL App (1st) 152157, ¶ 44. Santiago testified that defendant approached the van and asked about Santiago's gang affiliation. *Id.* Santiago then saw defendant, upon encountering Cage, ask about his gang affiliation and shoot him three times. Santiago did not see Cage make physical contact with defendant, and testified that Cage was too far from defendant to hit him. *Id.* Although Glassco could not identify the shooter, she testified that a man on the driver's side of the van asked for Santiago's gang affiliation and then exchanged words with Cage about his gang affiliation before shooting him. *Id.* Further, Diosdado—who was in defendant's vehicle— similarly testified that defendant approached another vehicle, checked for the occupants' gang affiliations, and then spoke to Cage about gang affiliations, whereupon she heard three or four

shots. Although Diosdado stated she did not see the interaction between defendant and Cage, her testimony is consistent with the State's other witnesses, Santiago and Glassco. *Id.*

¶ 57 Additional evidence suggests that defendant was the aggressor. He was armed. He testified that he opposed Cage's gang affiliation and issued the first insult before shooting Cage, an unarmed man whom he did not know, three times. Further, defendant's claim that he acted in self-defense is not only uncorroborated, but inconsistent with his subsequent actions. See *People v. Blair*, 2011 IL App (2d) 070862, ¶¶ 42-43 (where trial court failed to comply with Rule 431(b), rejecting claim that evidence was "closely balanced" where the defendant initiated a struggle from behind the victim and fled rather than contacting authorities or calling an ambulance). In admitting to the shooting to Cervantes, defendant made no mention of self-defense; rather, he told Cervantes that the victim "fell, dude, in front of me, dude. And when I—and when I tried to [shoot] him *** again I didn't have anymore." Defendant said he told another individual, presumably Davila, to "run" and expected him to "take the blame." Defendant also fled the scene; Diosdado testified that defendant got back into the Taurus and told her to "go," and the testimony of Santiago and Glassco indicates that Glassco called 911. Finally, although defendant challenges Santiago's credibility on the grounds of his prior misdemeanor theft conviction, DUI charge, and admitted cocaine use, defendant had a prior conviction for the more egregious crime of armed robbery. Because the evidence was not closely balanced, defendant is not entitled to relief under the plain error doctrine.

¶ 58 In sum, because the evidence was not closely balanced, defendant is not entitled to relief under the first prong of the plain error doctrine. Consequently, defendant cannot show that appellate counsel was ineffective for failing to argue that the trial court's noncompliance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) was plain error. As such, defendant's

postconviction petition did not state the gist of a constitutional claim. The circuit court therefore did not err in summarily dismissing the petition.

¶ 59    Affirmed.